In the Matter of I. HASBROUCK CHAHOON, Petitioner, against CARROLL E. MEALEY et al., Constituting the State Tax Commission, Respondents.

Third Department, June 3, 1944.

*Laurence Graves,* attorney for petitioner.

*Nathaniel L. Goldstein, Attorney-General (John C. Crary, Jr.,* of counsel), for respondents.

BLISS, J. This issue arises out of an item of $48,000, entered as a deduction in petitioner's income tax return for the year 1936. It was a loss sustained by him on account of his participation in a so-called junior equity agreement entered into by him and certain other individuals for the purpose of restoring the impaired capital and surplus of the Plattsburg National

Bank and Trust Company so that the bank could continue to operate. The statute, Tax Law, section 360, allows as deductions in computing net income '' All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, or for the production * * * of income '' and losses sustained '' in any transaction entered into for profit, though not connected with the taxpayer's trade or business.''

On September 28, 1931, petitioner was a stockholder, director and president of the Plattsburg National Bank and Trust Company, the largest bank in the Adirondack area, consisting of Franklin, Clinton and Essex Counties, with deposits of approximately $10,000,000. His salary was $10,000 per year. He was president of J. & J. Rogers Company, a corporation engaged in the manufacture of sulphide pulp and paper at Ausable Forks, N. Y., from which he received a salary of $12,000 per year. This corporation was principally owned by members of petitioner's family, had gross assets in excess of $2,000,000 and employed about 350 people. He owned one third of the capital stock and was an officer and director of Ausable Credit Corporation of Ausable Forks, from which he received a salary of $3,000 per year. This corporation was principally engaged in financing the purchase of automobiles and refrigerators and had assets in excess of $500,000. He received a salary of $1,000 from the Northern Insuring Agency, Inc., of which he was a stockholder, director and vice-president and which had offices in Ausable Forks and Plattsburg. He was a stockholder, director and president of Adirondack Corporation, Ltd., with assets in excess of $800,000 and over 66% of the preferred stock of this corporation was owned by members of his family and the entire common stock was owned by the J. & J. Rogers Company. He owned one seventh of the capital stock and was an officer and director of Chazy Orchards Company, Inc., of Chazy, N. Y., which owned and operated one of the largest apple orchards in the world. He was a member of the board of managers of Delaware & Hudson Railroad Corporation for which he received a salary of $240 per year.

During the depression years of 1930 and 1931 several banks in the nation were forced to close. In September, 1930, the trust company above mentioned took over the assets and assumed the liabilities of the First National Bank of Plattsburg to prevent its closing. A $200,000 depreciation then existed in the bond account of this latter bank. In March, 1931, the First National Bank of Rouses Point, N. Y., and the First National

Bank of Champlain both in the immediate vicinity of Platts-burg were closed by the Comptroller of the Currency and on May 31, 1931, the Merchants National Bank of Plattsburg was hurriedly reorganized with the assistance of the trust company to prevent its closing. On July 17, 1931, the capital of the trust company itself was impaired to the extent of almost $150,000 and a previous surplus of $750,000 had been wiped out and its officers and directors were informed by the Comptroller of the Currency that this situation must be remedied or the trust company would be closed. After some negotiations petitioner and fifteen other individuals entered into a so-called junior equity agreement by which these individuals, through a trustee, paid in to the trust company by their individual notes, $400,000, and acquired a junior interest in certain depreciated securities of the trust company, which junior interest then substantially represented the extent of the depreciation. Under this agreement receipts of interest and from the future sale of the securities were to be apportioned between the bank and the trustee and it was in fact credited on the notes given by the individuals, including petitioner. The agreement states that the trustee and his associates should not make a profit except that if the control of the bank should pass to others not then directly interested therein or the bank was consolidated or should discontinue business from any cause whatever, then any net profits on the whole transaction made by the trustee and his associates resulting from their purchase of the junior interest in these bonds should be obtained by and belong to them. The primary object of the agreement, however, was to save the trust company from closing with the consequent loss to the stockholders and officers and to other corporations in which petitioner was interested.

At the time this agreement was made on September 28, 1931, the corporations in which petitioner and his family were interested and from which he was receiving salaries, had deposits with the trust company totaling $256,555.59. Petitioner participated in the agreement to the extent of $100,000 or one-fourth of the total of $400,000. In June, 1935, the trust company issued and Reconstruction Finance Corporation purchased preferred stock of the trust company and the junior equity agreement was thereafter terminated. Upon its termination in the fall of 1936 petitioner paid $48,000 to the trust company as the balance then unpaid on his note and this sum is the extent of his loss by reason of his participation in the agreement.

It is contended by petitioner that this loss was an ordinary and necessary expense paid by him in carrying on a trade or business and in the production of income. In deciding the question we receive little help from the decisions in our own jurisdiction. *People ex rel. Kernochan* v. *Wendell* (198 App. Div. 197, affd. 232 N. Y. 551) involved the expenses of a committee of an incompetent person in resisting litigation to recover unpaid taxes and the court regarded the incompetent as one who if competent would have been retired from business. The taxpayer in *People ex rel. Merrill* v. *Gilchrist* (212 App. Div. 763) was engaged only in investing and reinvesting her funds. The taxpayer in *People ex rel. Whitney* v. *Loughman* (220 App. Div. 30) was not engaged in continuous or permanent activities outside of a partnership to which he belonged and through which he operated.

The Federal Income Tax statute (U. S. Code, tit. 26, § 23) is substantially identical with that of our State and therefore the Federal decisions interpreting the same are highly persuasive. In *Flint* v. *Stone Tracy Co.* (220 U. S. 107) business was defined as a very comprehensive term and embracing everything about which a person could be employed. In *Van Wart* v. *Commissioner* (295 U. S. 112) an attorney's fees paid by a guardian conducting litigation to secure income for his ward was not a business expense and so was not deductible on an income tax return. In *Welch* v. *Helvering* (290 U. S. 111) payments by a commission agent of debts of a corporation of which he was formerly secretary, for the purpose of strengthening his own name and credit, were held not to be ordinary expenses in carrying on a trade or business. But a person who devotes his time to the active management of his property and also to active participation in the management of the companies in which his property is invested, is carrying on business within the statute. In *Foss* v. *Commissioner of Internal Revenue* (75 F. 2d 326) it was stated: "The line comes between those who take the position of passive investors, doing only what is necessary from an investment point of view, and those who associate themselves actively in the enterprises in which they are financially interested and devote a substantial part of their time to that work as a matter of business." In *Kales* v. *Commissioner of Internal Revenue* (101 F. 2d 35) the taxpayer engaged in buying and selling securities which she owned in her own right was allowed to deduct as ordinary and necessary expense paid in carrying on business, certain attorney fees incurred in connection with

a suit to recover income taxes. The *Foss* and *Kales* cases were discussed by the United States Supreme Court in *Higgins* v. *Commissioner* (312 U. S. 212) as being ones in which the opinions turned on the extent of the taxpayer's participation in the management of corporations in which investments were held and this test was inferentially approved. The court then applied it to the case at hand and the taxpayer's deductions were not allowed because his activities were confined to keeping records and collecting interest and dividends from his securities and giving managerial attention to his investments. He had made only limited shiftings in his portfolio. It was pointed out that he did not participate directly or indirectly in the management of the corporations in which he held stock or bonds.

The test thus adopted by the Federal courts under a similar statute seems to be the most reasonable interpretation. One who is busily engaged participating in the affairs and management of corporations in which he is financially interested surely is in business. He is not a mere investor. His interest in business is active and not passive.

The application of this test to the instant case leads to but one conclusion. This taxpayer was constantly engaged in the management and activities of the corporations in which his capital was invested. Indeed, he must have been a very busy man because he held executive offices in six different corporations and was one of the board of managers of the seventh. He was in business and not an investor. His participation in the junior equity purchase agreement was necessary to preserve his extensive interests and salaries in these various corporations, particularly the trust company. It is common knowledge that many similar agreements were made at that time. This one was necessary to prevent the failure of the bank and the consequent losses to petitioner. While not primarily for profit, the agreement provided for a profit in case of the sale or liquidation of the bank. He did not expect to make money by it but he was trying to prevent serious loss. The preservation of his present income from his several executive offices and by way of dividends on his stock investments is implicit in the agreement. His were not altruistic motives. He was faced with financial ruin and made this agreement to prevent it. The loss was both ordinary and necessary and was an expense incurred in the carrying on of business within a fair and reasonable interpretation of the statute.

The determination should be annulled, with fifty dollars costs and disbursements to the petitioner, and the matter remitted

to the Tax Commission for the restatement of the tax and the ordering of a refund, with interest.

All concur.

Determination annulled on the law, with fifty dollars costs and disbursements to petitioner, and matter remitted to the Tax Commission for a restatement of the tax and ordering of a refund, with interest, in accordance with the opinion.